We are ready. May it please the Court. Well, actually, before I get started, I'd like to reserve three minutes for rebuttal. May I watch your time? May it please the Court. My name is Barbara Arnold, and I represent Nancy Coggeshall in her claim for Supplemental Security Income and Social Security Disability Insurance Benefits. Now, this case is one in which there was a subsequent application, which was granted as of one day after the ALJ decision that is on review before you. Ms. Coggeshall has been diagnosed, among other things, with chronic Lyme disease, and that is the crux of the medical condition that we bring for your consideration today. The ALJ decision in the subsequent application found that evidence that was submitted for consideration in the application that is on review before you found that that evidence was meaningful and that that was the basis for the grant of the subsequent application. The ALJ in the case that's before you today gave no consideration, not even a mention, of that evidence. The evidence in question is a collection of laboratory findings, a CD57 test, which is a test of immune function that's highly specific for Lyme disease, as well as the damage done by Lyme disease. That was Dr. Gisler's report. Ann, yes? Correct, Your Honor. Dr. Gisler had assessed the claimant, Ms. Coggeshall, for chronic Lyme disease and ordered a number of tests. The ALJ decision that's up for review here said that there were no treatment notes from Dr. Gisler, which is factually incorrect. Now, counsel— I have a question about that. I'm looking at what we have in the ER, and I'm looking at the treatment notes and all the things that Dr. Gisler—is that how you pronounce her name? Gisler, correct. If I look in the upper left-hand corner, the Xerox is such that almost all of Dr. Gisler's name is gone. Was that true in the documents that the ALJ had? I'm trying to figure out why the ALJ made such an obvious mistake. I mean, the ALJ says there are treatment records, and they're right here in front of us. I think that those treatment notes were identified in the ERE, which is the Electronic Record Express. That's the nomenclature Social Security uses as just the name of the laboratory. However, in our pre-hearing briefs, we brought it to the ALJ's attention that these were Dr. Gisler's notes. There's been no contention in the defense briefing that these were not to be associated with Dr. Gisler. No, it's clear they're here, and the only question is how could the ALJ have made such an obvious mistake? But, obviously, it is a mistake. Yes, we agree it is a mistake, and it is a harmful mistake because the ALJ's analysis carried through. Her perception that there was no evidence upon which Dr. Gisler could premise her medical opinion was a posture that was carried through the entire analysis of this ALJ decision. I have a question about the treatment by the ALJ of Dr. Gisler's assessment. The ALJ writes, indeed, the limitations set forward in Dr. Gisler's opinion are so extreme as to appear implausible, which suggests patient advocacy and discredits the entire opinion. I assume what the ALJ is talking about is what's on E.R. 592 and, I guess, 591, particularly 592, where for every limitation, Dr. Gisler writes, never, never, never, never, never. You mentioned in your brief that the question was a weird question. The question asked is to indicate how often the patient can perform each task, mark the number of hours you estimate the patient can sustain a physical task in a competitive work situation, taking into consideration whether the patient can adequately perform the action for an eight-hour day in a consistent, ongoing manner. The way that question is ordinarily asked is in an eight-hour day, not for. I mean, it strikes me as though Dr. Gisler answered the question entirely consistently with, well, she can't do it all the time. Yes, Your Honor, we agree. The question, just as the ALJ seems to have overlooked the objective findings that support Dr. Gisler's opinion, the ALJ seems to have overlooked the call of the question. Now, I hope the question isn't too weird, but it was trying to get at, could this patient, Ms. Cogschell, be called upon to perform those actions? But you look at that same form in other, in fact, in this very case, for other treating or examining physicians, the question is asked in rather than for an eight-hour day. All right, well, I'm... Meaning, there's a reason why the questions were answered this way, and it seems to me, given the doctor's assessment, that's the right answer, given the question. We totally agree. And if I may continue with regarding the way that the ALJ applied the analysis throughout the opinion, she also applies this perception of a lack of foundation and what she calls advocacy, very strong rhetoric against Dr. Gisler's opinion. And she applies that to how she assesses Ms. Cogschell's statements of her functioning, as well as the third-party statements. We feel that those are harmful errors that not only are worthy of being reversed, but are worthy of a direction to calculate and pay benefits. And Dr. Gisler was her treating physician, too. Dr. Gisler was a treating physician, although albeit for a limited period of time. There were two encounters. However, there is a note with a... There was a conference between Dr. Wells, who was the regular, more consistent treating physician, and Dr. Gisler about the very findings that we're complaining about the ALJ having overlooked, in which Dr. Wells then treated Ms. Cogschell for Lyme disease, although that treatment was not able to be sustained through to resolution of the impairments. Did you find, or what's your position on whether Dr. Wells and Dr. Gisler had substantially different opinions? I don't think they have substantially different opinions. I think they have very consistent opinions, although with regard to the document that Judge Fletcher was pointing out, where Dr. Gisler marks never, never for the 8-hour workday criteria, Dr. Wells has her being able to lift 10 to 20 pounds less than one-third of the 8-hour workdays. Well, that's because the question he was asked was in an 8-hour workday. He was asked a different question. I see. So there may have been... Okay, so I believe, we believe, on behalf of Ms. Cogschell, we are putting it before you that those two opinions are entirely consistent, and I see my time is running out, but I just also wanted to say that the opinions on which, the medical opinions on which the ALJ gave weight did not have these findings in the case of the consultative examiner, so he did not consider Lyme disease as part of the picture, and the state agency medical reviewer listed a number of objective findings and none of which were the findings that we are saying are the most crucial and significant in Ms. Cogschell's case. I'll reserve my time. Thank you. Thank you. You may proceed. Good morning, Your Honors. I'm Gerilyn Gulseth, Counsel for the Commissioner of Social Security. I wanted to point out that Dr., the ALJ was looking at this entire record, and not just Dr. Giesler's opinion in isolation. That can't be right. She was not looking at the entire record. She didn't see the treating records of Dr. Giesler. That's true. We do acknowledge that the ALJ misstated that there was no treating record. It appears that Dr. Giesler saw the claimant on one occasion and conducted laboratory testing, and then they had a telephone consultation about that testing. That was a factual error, but not an error that was harmful to the ALJ's overall assessment of the evidence. The ALJ relied on substantial evidence, including Dr. Kamal's opinion, and I think the claimant gives short shrift to Dr. Kamal's opinion, saying that he hadn't considered the claimant's Lyme disease, but Dr. Kamal was board certified in physical medicine and rehabilitation. He observed the claimant. He made physical examination findings. He was aware that she was being sent for testing for Lyme disease, and that she complained or had a history of chronic fatigue. He also diagnosed her with encephalopathy, which he attributed... How do we know that he would have given the same answer had he known that she did have Lyme disease instead of simply being tested for? I think his opinion was based on his observations and also his physical examination findings of the claimant, and that's important. If you've got a physical examination of someone, Lyme disease doesn't show up. It's got to be tested for, and the manifestations of Lyme disease are fatigue, all kinds of things that are being reported by the patient. To your point, Your Honor, there are certain manifestations of it that aren't going to be objectively verified during a physical examination, but some of which can be. For instance, if someone is very fatigued, they're going to look very tired. For example, she's complaining or complained during the period under review of extensive neurological findings, paresthesias, numbness. That's why she was sent to Dr. Evangelista for evaluation. Everything was normal. She also complained of extensive pain, but she wasn't on any pain medication. She also complained of cognitive decline, which is something that can be objectively verified, and none of the mental status examinations verified that. This was all part of the picture. It wasn't just the subjective complaint of fatigue and the laboratory finding of test results indicating Lyme disease. The ALJ was considering the entire record in terms of this. The lack of objective support is something that, yes, ALJs throw out if there's not objective support, and we understand that Lyme disease is different in that kind of a way, but certainly this record did not support, and in fact, many times during this period under review, was contradicting what the claimant said about the extent of her limitations. Well, I'm having a little trouble understanding, though, how you can say that the failure to consider Dr. Giesler's treatment report can be ignored or that it's not prejudicial. The treatment report was not insubstantial. Certainly it wasn't the same as Dr. Wells' report, but they weren't markedly different, were they? Well, Dr. Wells had a treatment relationship with the claimant. Most of his examinations were normal. In fact, he mostly just described the claimant as pleasant and on a couple of occasions said she looked fatigued, although one of those was attributable to her being hypothyroid at the time. Low thyroid can cause fatigue, but with respect to Dr. Giesler's treatment record, she saw the claimant once, recorded the claimant's symptoms, performed apparently a limited exam, which was normal, did send her out for lab testing, which indicated Lyme disease. We are not disputing that there was a potential diagnosis of Lyme disease at the time. The question is, does this record at that time support the extent of the limitations that the claimant was complaining of? The ALJ did not find Lyme disease as a severe impairment, or excuse me, she did not find it as a severe impairment, but that doesn't mean she did not find it as an impairment. She simply found it non-severe. So the question is... Can you address the question I had with respect to the ALJ's finding when the ALJ writes, indeed the limitations set forth in Dr. Giesler's opinion are so extreme as to appear implausible, which suggests patient advocacy and discredits the entire opinion? I assume what the ALJ is talking about is this series of check marks that say, no, never, never, never, never, never. But how do you respond to the point that the question asked was not, can she do this how many times in an eight-hour day? But the question asked was, can she do this for an eight-hour day? It seems to me that the ALJ misunderstood the question and the response. How do you respond to that? Well, number one, I think one of the major reasons that the ALJ gave for rejecting Dr. Giesler's opinion is that it was inconsistent with the rest of the evidence, even Dr. Wells's opinion. But in terms of the context of her opinion and the way the question was posed, it still is a pretty extreme opinion given that the claimant herself was conducting some amount of lifting and walking and sitting and standing during an eight-hour day as she was running errands. Wait a minute. You say it's an extreme opinion. If the question is, can she do it continuously during an eight-hour day, of course she cannot. That was her testimony. She can do it sometimes, but she cannot do it continuously for an eight-hour day. And Dr. Giesler, reading the question, says, of course she cannot. Never. But Dr. Giesler was saying she could sit for a very limited amount of time, and even the claimant herself testified that she could sit four to six hours. But the sitting, that's the same question. It says four an eight-hour day in a consistent and ongoing manner. The same question is asked, and of course she answers it in the same way. But the claimant doesn't testify that she's in a supine position for 20 hours a day, which it would seem as if that opinion would... Counsel, isn't Dr. Giesler's opinion about how many hours she could sit a day? And if you answer never, then that means that she could never sit during an eight-hour period. So isn't the call to the question how many hours could she sit during an eight-hour period, eight-hour workday? Yes. So if you answer never to that, that means she can't sit for one minute in an eight-hour day. Correct, and that's a rather extreme opinion. That seems extreme to me. I agree. But the question isn't merely four an eight-hour day. The question is four an eight-hour day, five days a week, in a consistent and ongoing manner. That is to say, not for a minute, not for an hour, but can she sit consistently and ongoing for an eight-hour day? And the answer is no. According to Dr. Giesler, but that is not what the rest of the record indicates. Well, according to all the rest of the records, the question asked is can she sit continuously for eight hours? And the answer is no. She can sit for a while, maybe an hour or two, but she cannot sit continuously for eight hours. That's the question that was asked. And that's Dr. Giesler's opinion, which was extreme given the rest of the evidence. Dr. Kamal believed that she could. I don't think you're taking my point. If Dr. Giesler is asked, can she sit continuously for eight hours, Dr. Giesler says no.  She cannot sit continuously for eight hours. Do you disagree with that? I disagree that the record supports that opinion. Does the record support that she can sit continuously for eight hours? That's the question that was asked. Well, the ALJ didn't find that she could sit continuously for eight hours. He found that she could perform light-level work and go back to her light and sedentary work. I asked you a different question. Does the record support a finding that she could sit continuously for eight hours? I don't think she established that she could not, and it's her burden to establish that. Does any doctor say that she could sit continuously for eight hours for five days a week? But that's not a necessary opinion for... I mean, that's just not something the other doctors were asked in terms of the state agency and Dr. Kamal's opinions in order to perform... The only doctor who was asked that question was Dr. Giesler, and Dr. Giesler said no, she cannot sit continuously for eight hours five days a week. That's what Dr. Giesler said based on her one-time exam of the claimant, in which she recorded no clinical, abnormal clinical findings. Well, she said Dr. Giesler did say she had so many physical impairments she was completely unable to perform work and work activities. And that was also supported by Dr. Wells, who once again precluded any work, both of them. So are you saying those are to be ignored because your doctor says otherwise? I don't see in the record that that's been in any way distinguished. Of course, the ALJ didn't even really address Dr. Giesler. So the question you're asking is did the ALJ properly reject Dr. Giesler and Dr. Wells' opinions? And first I wanted to make a point about Dr. Giesler's opinion. She also diagnosed fibromyalgia, which was completely unsupported, and attributed the limitations to that diagnosis. That kind of came out of nowhere. Where in the record is that completely unsupported? In order to establish a diagnosis of fibromyalgia, a claimant has to have a certain number of symptoms and clinical findings that support that diagnosis, and that wasn't established here. And the ALJ made that clear in the order, or is that just your opinion? The ALJ did not specifically state that, but the ALJ did state... Okay, so then you're offering your opinion. The ALJ stated that Dr. Giesler's opinion was very extreme and bordered on patient advocacy. Without any facts to support that conclusion, which is a very strong conclusion. Well, I think the context and the opinion itself was very extreme, and that's what the ALJ was meaning. But to your question about whether the ALJ properly rejected or could reject Dr. Giesler and Dr. Wells' opinions, the ALJ was not required to accept them simply because they were treating physicians. Dr. Giesler had a very, as the claimant admits, a very limited treatment relationship with the claimant. But be that as it may, the ALJ was looking at this entire record, Dr. Wells' treatment notes, for instance, where there were absolutely no clinical manifestations other than maybe two occasions he observed that she looked fatigued. And this is a two-year period. Most of the time he was just describing her as pleasant, or when he did record an exam it was normal. This is very different from what the claimant was alleging. The claimant was not only alleging subjective complaints of fatigue, but extensive neurological problems, extensive cognitive problems. You simply just are not supported by the treatment reports. And Dr. Kamal— Unless my colleagues have any other questions. Just one other question on the issue of— Oh, I apologize. Assuming we ever get to this issue of remand. So the petition was denied on the 15th, and she was cleared disabled on the 16th. What would have happened between midnight on the 15th that would support her having been found disabled on the 16th such that remand would not be required? I think your honor is asking whether she had some sort of traumatic event or injury that caused the subsequent ALJ to find her disabled that next day. But when you look at the— I'm sorry to interrupt, but what I'm really saying is there's a case, and there's a position in the Ninth Circuit under Luna that it has to be remanded if there are issues that are not completely reconcilable. And there's nothing in the record to explain what happened on the 15th, midnight on the 15th, that would have caused her to be disabled on the 16th. Am I right? Well, this wasn't a— Yes, you're absolutely correct. This wasn't a traumatic injury that caused her to be disabled on the 16th. But as we explained in our response to claimant's motion with the subsequent decision and the new evidence, there were additional impairments, definitely more extensive testing, just more support for the claimant's allegations of a disabling impairment. And so the two decisions can be reconciled because the contemporaneous evidence, and in this case before you, from June 2013 to September 2015, does not support the extent of the claimant's allegations. They did in the subsequent application, and that's why it was reasonable for the agency to pay her on that claim. But for the remand, we're talking about one day, 15 versus 16, right? Under Luna, these two decisions can be reconciled. In Bruton versus Masanari, there was a difference of a day, and this court held that there was no reason to remand. No, in Bruton it was a much longer period of time. I think it was three years, not a day. I'm not certain, Your Honor. I don't want to make that— based on my recollection, it was a decision that was the next day, but I don't want to— I'd be happy to submit additional briefing on that. I don't want to misstate anything. Having said that, though—oh, I'm sorry. Unless you want to just wrap it up. You're seven minutes over at this point. Oh, I'm sorry. I apologize. Yes, many times in a subsequent case there will be an onset date that is the day after a prior finding. It doesn't necessarily mean that something happened at midnight on the day before. In a chronic type impairment, like we had in this particular case, the claimant had more evidence, additional testing, additional impairments that explained why she was paid on that subsequent application. And the commissioner would ask that the court affirm the decision before you. Thank you. Thank you, Counsel. Your Honors, I would like to address the last point that was raised about the subsequent ALJ decision. Now, the subsequent ALJ decision stated that Ms. Cogshall has had extensive chronic infections, notably chronic Lyme disease, with co-infections of babesiosis and bartonellosis, and that this has persisted as evidenced by testing of low CD57 count and Lyme-weighted bands on— But didn't she also have a new cancer diagnosis? She did, Your Honor. She had a new cancer diagnosis that was one year after the onset date that was awarded by the subsequent ALJ. And that subsequent ALJ looked at a medical opinion that was a treating medical opinion and that was looking at the entirety of Ms. Cogshall's Lyme evidence and included in that subsequent doctor's opinion consideration of the very evidence that was overlooked in this case. To take your argument, wouldn't we have to, like, imagine the hypothetical that she never got the cancer diagnosis? Because there's obviously a new evidence that led to the new disability finding. Your Honor, I believe that it was a period of time after, and the doctor's opinion that found— that opined that she was disabled as of January 16, 2015, one day after this decision in front of you, looked at that older evidence and said that the CD57 test is a highly specific Lyme test. It shows extreme damage to the immune system caused by Lyme disease. I want to make sure I understand your answer to Judge Boumediere's question on cancer. The second award of benefits runs from a date that precedes the cancer diagnosis? That's correct. So the second ALJ is awarding benefits for a period before she has cancer? That's right. That's right. And quotes the very evidence that we are objecting to, saying that it was overlooked. And we know what would happen if this case were remanded with direction to reevaluate because, in effect, that has happened. This very evidence has already been considered by another ALJ, and the commissioner did not appeal that ALJ's decision. So as a finding of fact, a third ALJ would have to accept this as the fact of this case. Counsel, do you agree with Judge Fletcher's characterization of Dr. Giesler's opinion? As I read it, it says, please mark the number of hours you estimate the patient can sustain for an eight-hour day. And if you circle one, that means you could only sit one hour a day. Is that how you would interpret Dr. Giesler's? In an eight-hour day, she could only sit for one hour. Is that how you interpret that? There's that phrase with the consistent and ongoing manner, which is designed to say, if an employer called upon you and said, you have to do this right now, the customer came in, you have to address their needs right this moment, would that person be able to be called upon to do it? Yes. And Dr. Giesler said never. If you circle one, that means she could only sit consistently in ongoing manner for one hour in an eight-hour day. A total, yes. Right. And if the doctor marked never, that means that she can't lift zero times in an eight-hour day. Well, I don't think Dr. Giesler interpreted it that way, but of course we can. It seems like the call of the question, the ALJ has overlooked it. Well, would you admit at least it's ambiguous, and so do we defer to the ALJ's interpretation? Well, the ALJ has to resolve ambiguities that appear in the face of the record, and the ALJ makes no mention of the call of this question, just says, I'm saying that that's an absolute. If you interpret it the other way, it makes no sense, because no one could sit for eight hours consistently in ongoing manner for eight hours a day. I mean, I don't think I could do that. Well, she did not answer it that way. But there is a significant piece of evidence here that has never been addressed, and that the ALJ relied upon medical opinion that also either did not have it in their possession when they did their evaluation or did not include it in their list of objective findings that they were considering, and that the CD57 test shows damage to the immune system that would give rise to pain and fatigue to the degree that Ms. Cogschill has claimed. Now, there's also a case just recently out by the Eleventh Circuit that, if I may quote, and I'll submit this as a subsequent, as a post-hearing note, but it's Miller against Commissioner, and that's from March of this year, and it says, normal clinical observations are not inconsistent with the disabling effects of Lyme disease, and applies that to the claimant's claims as well as to the doctor's assessment. So saying that she has normal range of motion or intact cranial nerves really isn't going to tell you what you need to know. Thank you, counsel, unless you... Great. Thank you, counsel. Thank you. This case will be submitted.
judges: FLETCHER, BUMATAY, Silver